22-2954
*Linton v. Zorn*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2023

(Argued:  October 25, 2023      Decided:  April 24, 2025)

Docket No. 22-2954

———————————————

SHELA M. LINTON,
Plaintiff–Appellant,

v.

JACOB P. ZORN, DETECTIVE,
Defendant–Appellee,

VERMONT STATE POLICE, PAUL WHITE, SUPERVISOR, THOMAS L'ESPERANCE,
COLONEL,
Defendants.

———————————————

Before:      CABRANES, SACK, AND PÉREZ, *Circuit Judges*.

In this police use-of-force case arising from a protest at the Vermont statehouse, Plaintiff-Appellant Shela M. Linton appeals from a judgment entered on October 19, 2022, in which the United States District Court of Vermont (Geoffrey W. Crawford, *Judge*) granted Defendant-Appellee Sergeant Jacob P. Zorn's motion for summary judgment.  In relevant part, the district court granted Sergeant Zorn qualified immunity on Ms. Linton's Fourth Amendment excessive-force claim brought pursuant to 42 U.S.C. § 1983 because it concluded that no clearly established law put Sergeant Zorn on notice that his actions may have violated Ms. Linton's rights.  On appeal, Ms. Linton argues that (1) the district court erred when it decided that *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004), did not clearly establish law applicable to the outcome of this case; and (2) the district court improperly failed to construe the facts in the light most favorable to Ms. Linton, the non-movant, and in so

doing, wrongly resolved genuine disputes of material fact in favor of Sergeant Zorn.  For the reasons set forth below, we agree, and therefore

VACATE the district court's judgment and REMAND for further proceedings consistent with this opinion.

Judge Cabranes concurs in part and dissents in part in a separate opinion.

> KEEGAN STEPHAN, Beldock Levine & Hoffman, LLP, New York, NY (Eliza van Lennep, Langrock Sperry & Wool, LLP, Burlington, VT, *on the brief*), *for Plaintiff-Appellant Shela Linton;*
>
> NEIL F.X. KELLY, Assistant Attorney General, *for* Charity R. Clark, Vermont Attorney General, *for Defendant-Appellee Sergeant Jacob Zorn.*

SACK, *Circuit Judge*:

Ms. Shela Linton attended a sit-in protest on January 8, 2015, at the Vermont statehouse (the "Statehouse").  She and approximately 200 other demonstrators were protesting what they thought to be the Vermont governor's failure to adequately support a movement toward universal healthcare.  That evening at 8 p.m., when the Statehouse was scheduled to close, law enforcement officers advised the remaining demonstrators that if they did not leave, they would be subject to arrest.  Ms. Linton and some 28 other demonstrators nonetheless remained in the legislative chamber of the Statehouse, sitting in a

2

circle on the floor with arms linked, singing songs that Ms. Linton characterized as expressive of their social justice ideals.

After delivering this warning to the remaining demonstrators, law enforcement officers began to arrest the demonstrators. Several videos that were filed in the district court contained remarkably clear footage of many of the arrests, including Ms. Linton's. Ms. Linton, who would later testify that she did not intend to leave the Statehouse voluntarily, remained seated while several of her fellow demonstrators were arrested. Some stood up and walked out voluntarily, escorted by law enforcement officers. Others were dragged or carried out by several officers. Only one of them complained of pain; he said it resulted from an officer fastening handcuffs too tightly.

Sergeant Jacob Zorn and Trooper Seth Richardson approached Ms. Linton. Sergeant Zorn asserts that he asked Ms. Linton to stand; she alleges that she heard no clear command. Nevertheless, Ms. Linton knew that the police would make her leave the Statehouse by physically removing her and witnessed multiple arrests before her own. Approximately five seconds after Sergeant Zorn asked Ms. Linton to stand, as indicated by videographic evidence, Trooper Richardson took hold of Ms. Linton's right arm and Sergeant Zorn of her left.

Trooper Richardson tugged at Ms. Linton's right arm three times before successfully unlinking Ms. Linton's arm from the arm of the demonstrator to her right, gaining control over that arm. Sergeant Zorn attempted to unlink Ms. Linton's left arm from the arm of the demonstrator to her left and applied pressure to that arm as part of his attempt to remove Ms. Linton from the Statehouse. At one point in doing so, and *after* unlinking Ms. Linton's left arm, Sergeant Zorn used a "rear wristlock"—a "pain compliance technique" in ejecting her from the Statehouse.

While Sergeant Zorn sought to remove Ms. Linton, she cried out in pain. Sergeant Zorn made repeated requests that Ms. Linton stand. Ms. Linton responded saying "I will not stand up." Sergeant Zorn stated, "I am not strong enough to pick you up, so please stand up." Ms. Linton shook her head side to side. Sergeant Zorn warned Ms. Linton that he would apply more pressure if she did not comply. She did not stand despite Sergeant Zorn's requests and orders; she asserts she could not do so because she was in too much pain, and any movement that Sergeant Zorn perceived as active resistance was an involuntary reflex to the force applied by Sergeant Zorn. Ms. Linton was eventually carried out of the Statehouse chamber by three officers. She continued to complain that

she was in great pain. As a result of the events of the day, she suffered permanent damage to her left wrist and shoulder and alleges that she has consequently been diagnosed with post-traumatic stress disorder, depression, and anxiety, apparently resulting from these events.

Ms. Linton brought this action in the United States District Court for the District of Vermont alleging, in relevant part, that Sergeant Zorn, in his personal capacity, violated her Fourth Amendment rights when he used unreasonable excessive force to remove her from the Statehouse chamber. Sergeant Zorn moved for summary judgment based on his argument that he was entitled to qualified immunity with respect to his alleged excessive use of force. The district court agreed, holding that there was no clearly established law that put Sergeant Zorn on notice that his conduct was unlawful, therefore rendering his actions as to Ms. Linton legally immune.

Ms. Linton now appeals this determination, arguing that the district court erred in concluding that no case law provided such sufficient notice to Sergeant Zorn. She also contends that the district court did not construe the facts of the case in the light most favorable to her as the non-movant, and in so doing made improper factual findings against her. The parties dispute the degree to which

Ms. Linton was resisting arrest, whether the degree of force used by Sergeant

Zorn was necessary and appropriate in response to the circumstances, and

whether Sergeant Zorn acted in good faith when applying this force.

We conclude that our decision in *Amnesty America v. Town of West Hartford*,

361 F.3d 113 (2d Cir. 2004), did clearly establish law governing Sergeant Zorn's

alleged behavior that is the subject of the case at bar, and that there exist genuine

issues of material fact that must be resolved by a jury[1] prior to determining

whether qualified immunity shields Sergeant Zorn from personal liability.  For

the reasons set forth in further detail below, we **VACATE** the district court's

order granting Sergeant Zorn's motion for summary judgment and **REMAND**

the matter for further proceedings consistent with this opinion.

## BACKGROUND

### I.    Factual History

On January 8, 2015, approximately 200 demonstrators, including Ms.

Linton, attended a planned nonviolent protest at the Statehouse.  The protest was

in opposition to the Vermont governor's asserted failure to move forward with

---

[1] Although we use the word "jury" throughout this opinion as shorthand when referring to findings of fact made or to be made by the district court, we recognize that a judge may properly act as a factfinder, as in a bench trial.

legislation that would ensure universal healthcare for all Vermonters.  Ms. Linton encouraged community attendance in the days leading up to the protest.  Many law enforcement officers were present at the Statehouse on the day of the protest, which coincided with the Vermont governor's inauguration ceremony.

Ms. Linton arrived at the Statehouse at around noon; she and all other demonstrators passed through Statehouse security checks, which ensured that they did not carry any weapons, and occupied the Statehouse legislative chamber.  She testified that she did not intend to voluntarily walk out of the Statehouse chamber that day, describing the protest as a "sit-in."  J. App'x at 152.  Although Ms. Linton contends that she did not expect to be arrested at the start of the protest, she understood that she might be arrested or removed by law enforcement officers if she remained at the Statehouse once instructed to leave.

At approximately 8 p.m., law enforcement announced to the demonstrators that the Statehouse was closed, requested that they leave, and informed them that if they did not leave, they would be subject to arrest for trespassing.  At the time, Ms. Linton and 28 other demonstrators sat in a circle on the Statehouse chamber floor, legs outstretched in front of them with arms linked at the elbows, "singing songs that expressed their social justice ideals."  J. App'x

at 132 ¶ 4.  Ms. Linton later testified in her deposition that, while at the time she decided she would not "voluntarily get up and walk out" of the sit-in, she expected that she would, at some point, "be asked to leave, and if [she] did not, [then she] would be lifted up in an appropriate way and physically be moved from the" Statehouse chamber floor by the police.  J. App'x at 158–59.

Failing to eject the protestors from the Statehouse, the officers began to make arrests.  They removed and arrested sixteen demonstrators of different genders and body types prior to approaching Ms. Linton, through techniques including placing the arms of protesters behind their backs, dragging the protesters by their wrists or arms, or lifting the protesters by their arms or armpits.[2]  As noted above, there is video evidence in the record on appeal showing these arrests.  They occurred anywhere between several seconds and several minutes apart.  Officers tapped on some of the demonstrators' shoulders or spoke with them briefly prior to arresting them.  Several demonstrators voluntarily stood up after officers approached them and walked out of the Statehouse chamber, escorted by officers who held one or both of their arms.

---

[2] Ms. Linton is a Black, 5'8" woman who weighed approximately 175 pounds at the time of her arrest.  She had pre-existing knee and shoulder injuries; her knee injury made it necessary for her to use her arms to stand up from a prone or sitting position.

Demonstrators who did not comply voluntarily were lifted and escorted, dragged, or carried out of the Statehouse chamber.  According to Ms. Linton, those who were carried out of the Statehouse chamber were lifted with "[l]ike a scoop underneath the arms."  J. App'x at 163.  She asserts that officers did not use pain compliance techniques on any of the demonstrators whose arrests she witnessed; she was present when only one demonstrator complained of discomfort because he felt his handcuffs were too tight.

Ms. Linton remained on the chamber floor in a partial circle facing inward with the demonstrators who had not yet been arrested.  Her arms remained linked with the arms of demonstrators on either side of her, and, according to Sergeant Zorn's testimony, she continued to sing.[3]  A state policeman, Trooper Seth Richardson, who participated in Ms. Linton's arrest, later stated in deposition testimony that he perceived the threat posed by the demonstrators at the time to be "[v]ery low."  J. App'x at 220.

---

[3] The district court noted that the demonstrators, including Ms. Linton, sang "We Shall Not Be Moved," a song that had been utilized by civil rights activists most prominently in the civil rights movement.  *See* David Spener, *We Shall Not Be Moved / No Nos Moverán: Biography of a Song of Struggle* 4–5 (2016) (describing the origins and popular usage of the song).

Sergeant Zorn, who was on special assignment at the Statehouse that day to help protect the governor's inauguration proceedings, approached Ms. Linton. He and Trooper Richardson stooped beside her, with Sergeant Zorn on Ms. Linton's left and Trooper Richardson on her right. Sergeant Zorn testified that he asked Ms. Linton to stand but she remained seated, continuing to sing. Video evidence of the protest and related arrests suggests that either Trooper Richardson or Sergeant Zorn said, "ma'am?" to Ms. Linton, but it is not otherwise clear from the videos of these events that were contained in the record on appeal what the officers said. *See* Video 2, 1:34. Ms. Linton stated that she did not receive a clear command from Sergeant Zorn at that juncture. Nevertheless, Ms. Linton knew that the police would make her leave the Statehouse by physically removing her and witnessed multiple arrests before her own.

After approximately five seconds, as indicated by videographic evidence, Trooper Richardson took hold of Ms. Linton's right arm and Sergeant Zorn of her left. Trooper Richardson tugged at Ms. Linton's right arm three times before successfully unlinking Ms. Linton's arm from the arm of the demonstrator to her right, gaining control over that arm. Meanwhile, Sergeant Zorn attempted to gain control over Ms. Linton's left arm by using his hands to disconnect her left

arm from the right arm of the demonstrator to her left.  According to Sergeant

Zorn, as summarized by his expert, Evan Eastman, at this point, Ms. Linton

"tensed her arm, attempted to hug the person's arm to her right harder and

pulled away."  J. App'x at 112.  Ms. Linton contends to the contrary that she

neither tensed her arm nor tightened her links.

Sergeant Zorn then successfully unlinked Ms. Linton's left arm from the

arm of the protestor to her left.  Sergeant Zorn contends that Ms. Linton resisted

his grip such that he "could not maintain control" of her arm.  Dist. Ct. Dkt. 74,

Ex. 3 at ¶ 7.  Ms. Linton has said, to the contrary, that her "arm naturally

returned back towards [her] body," and that Sergeant Zorn "had no trouble

securing and maintaining control of [her] hand once [her] arm was unlinked"

from the other protestor's arm.  J. App'x at 145.  Sergeant Zorn then "forced [Ms.

Linton's left hand] down and to the rear" and placed her in a rear wristlock.

Dist. Ct. Dkt. 74, Ex. 3 at ¶ 7.  Ms. Linton cried out in pain, and Sergeant Zorn

instructed her to stand up.

Ms. Linton did not stand up.  She contends that she was in too much pain

to do so.  Sergeant Zorn then allegedly twisted Ms. Linton's arm behind her back;

Ms. Linton shouted, "don't twist my arm!"  Video 3, 24:49–:52.  Other

demonstrators still present in the chamber shouted, "don't hurt her." *Id.* at 24:51–:56.

While maintaining her left arm behind her back, Sergeant Zorn then instructed Ms. Linton several times to stand up; Ms. Linton stated, "I will not stand up." Sergeant Zorn responded that "I am not strong enough to pick you up, so please stand up"; Ms. Linton shook her head "no." Sergeant Zorn continued to request that she stand up, and Ms. Linton replied that Sergeant Zorn was hurting her; in her complaint, she alleged that the pain she endured was equivalent to giving birth. Sergeant Zorn warned Ms. Linton that if she did not stand, he would use more pain compliance. He asked her, "If we stop hurting you, will you stand up?" Video 3, 25:13–:18. She did not respond. After asking her once more to stand, Sergeant Zorn applied more pressure and attempted to lift Ms. Linton up. She contorted her face and began to scream. According to Ms. Linton, Sergeant Zorn then told Ms. Linton that she should have called her legislator.[4] She allegedly perceived this statement as a threat.

---

[4] When asked in his deposition "If I told you that Officer Zorn told [Ms. Linton] that she could have just called her legislators, what would you think about that?" Trooper Richardson responded, "That's accurate." J. App'x at 228:22–25.

Sergeant Zorn and Trooper Richardson lifted Ms. Linton. Ms. Linton contends that she was in "extreme pain" and yelled out accordingly. J. App'x at 137. Sergeant Zorn counters that Ms. Linton continued to struggle, while Ms. Linton contends that her arm moved involuntarily because of the pain. After he had lifted Ms. Linton to her feet, Sergeant Zorn instructed her to stop resisting. Ms. Linton replied that she was not resisting. Sergeant Zorn told Ms. Linton to walk. Ms. Linton said that she was in pain; other demonstrators commented that Sergeant Zorn's actions were "not ok." Video 3, 25:38–:43. Ms. Linton then gasped and fell to the floor. She asserts that the pain caused her to fall involuntarily. After further expressions of pain from Ms. Linton and instructions from Sergeant Zorn to stand up and walk toward the chamber exit, Sergeant Zorn, Trooper Richardson, and a third officer lifted Ms. Linton by her arms and legs and carried her out of the Statehouse chamber.

The officers carried Ms. Linton toward a stairwell and asked her several times whether she would stand up. While officers held her limbs and stood over her, Ms. Linton shouted, "You guys hurt my arm! Get off me now! . . . I didn't do anything. Get off me. You broke my fucking arm!" *Id.* at 26:23–:32. The officers then lifted Ms. Linton and carried her toward the elevator, while she continued

to tell the officers to "get off [of her]." *Id.* One officer suggested that she get up and walk downstairs to the exit, to which Ms. Linton responded, "You're not giving me that option, you're holding me upside down." *Id.* at 26:45–:49.

The officers set Ms. Linton on the floor and asked her whether she would like to stand. She breathed heavily, saying that she was in pain. "You need to wait. I'm hurt." She continued breathing heavily, and said, "You have no right to hurt me like this." *Id.* at 27:16–:36. An officer responded, "We asked you as nicely and as many times as we could." *Id.* at 27:36–:38. Ms. Linton replied, "No, you twisted my arm behind my back before you gave me any demands [sic]." *Id.* at 27:38–:42. Sergeant Zorn made repeated requests that Ms. Linton stand before his ultimate use of the pain compliance technique. Ms. Linton accepted the assistance of another officer to stand up but reiterated that she could not use her left arm, exclaiming in pain when she was touched on her left side. Ms. Linton was helped to her feet and accepted an offer for medical attention. *Id.* at 27:44–28:01.

Ms. Linton received first aid treatment at the Statehouse. She testified that following the demonstration she experienced "a period of physical pain and psychological symptoms" that were "so acute [that she] had difficulty seeking

14

care." J. App'x at 147.  She later sought medical care from her primary care physician, underwent physical therapy, took naturopathic medicines, and had her arm in a cast and a sling for four to five months.

Following the demonstration, Ms. Linton was diagnosed with acute post-traumatic stress disorder, major depression, and anxiety.  She later testified that she "still experiences pain, stiffness, numbness, and other joint issues and dysfunction." *Id.*  Her expert, Dr. Leonard Rudolf, completed an independent medical evaluation following the demonstration and concluded that Ms. Linton had suffered permanent injury to her wrist and shoulder as a result of the events of January 8.

Only two of the demonstrators who were arrested after Ms. Linton complained that the arresting officers caused them pain, including, in one case, by "grabb[ing] [his] arm and . . . twisting," and, in another, by "tr[ying] to break [her] wrist."  Video 4, 1:19–:28, 3:26–4:02.

## II.    Procedural History

On January 5, 2018, Ms. Linton initiated the present suit in the United States District Court for the District of Vermont pursuant to 42 U.S.C. § 1983 against the Vermont State Police, then-Detective Zorn, retired supervisor Paul

White, and retired Colonel Thomas L'Esperance (collectively, the "Defendants").

The Defendants were named in their official capacities, and Sergeant Zorn was

also named in his individual capacity. Ms. Linton alleged that Sergeant Zorn

had violated her Fourth and Fourteenth Amendment rights by subjecting her to

the unreasonable use of excessive force on account of her race.

The Defendants moved to dismiss the complaint under Fed. R. Civ. P.

12(b)(1) and 12(b)(6). On November 28, 2018, the district court (Geoffrey W.

Crawford, *Judge*) granted the Defendants' motion as to Ms. Linton's claims

against the Vermont State Police and the individual defendants in their official

capacities. Order on Mot. to Dismiss, Dist. Ct. Dkt. 20 (Nov. 28, 2018). The

district court denied the motion, however, as to Ms. Linton's claims against

Sergeant Zorn in his personal capacity, reasoning that, taking all of Ms. Linton's

well-pleaded allegations as true, she had stated plausible Fourth Amendment

excessive force and Fourteenth Amendment equal protection claims brought

pursuant to 42 U.S.C. § 1983. The district court further reasoned that Sergeant

Zorn was not entitled to qualified immunity at this point in the proceedings

because "*Amnesty America* [*v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004)]

squarely governs this case, or at least supplied sufficient clarity or

16

foreshadowing that Detective [now Sergeant] Zorn should have understood that his conduct (as portrayed in Plaintiff's allegations) was unlawful." J. App'x at 40.

On April 15, 2022, following discovery and submission of Mr. Eastman's[5] expert report, which opined that Sergeant Zorn's use of force was reasonable, Sergeant Zorn moved for summary judgment on the grounds of qualified immunity. This time, the district court granted the motion as to both the equal protection and excessive force claims. *See Linton v. Zorn*, No. 5:18-cv-5, 2022 WL 17080324 (D. Vt. Oct. 19, 2022). With respect to equal protection, the court concluded that Ms. Linton had failed to produce sufficient evidence that the treatment she received was race-related to survive the motion for summary judgment. *Id.* at *16. As for the excessive force claim, the district court concluded that under the applicable test used to determine whether qualified immunity shields an official from personal liability, Sergeant Zorn had demonstrated that there was no clearly established law that put him on sufficient

---

[5] Mr. Eastman served as a law enforcement officer for 30 years. He was also an adjunct instructor at the Vermont Police Academy from 1998 to 2008. At the Police Academy, he provided non-lethal use-of-force and baton training to Vermont law enforcement officers at the basic training level and instructor level.

notice that the conduct of the sort he engaged in would violate Ms. Linton's Fourth Amendment rights. *Id.* at *14.

Ms. Linton appeals the district court's grant of summary judgment as to her Fourth Amendment excessive force claim only, asserting that Sergeant Zorn is not entitled to qualified immunity. She argues primarily that (1) the district court erred when it decided that *Amnesty America* did not clearly establish law applicable to the outcome of this case; and that (2) the district court improperly failed to construe the facts in the light most favorable to Ms. Linton, the non-movant, and in so doing, wrongly resolved genuine disputes of material fact in favor of Sergeant Zorn. For the following reasons, we agree and conclude that the district court did commit reversible error — Sergeant Zorn is not entitled to qualified immunity, at least at this stage of the proceedings because the appropriate fact-finder must make predicate factual findings before a determination of entitlement can be made.

## DISCUSSION

### I.  Standard of Review

"We review *de novo* a district court's determination of qualified immunity insofar as it is a legal issue." *Vasquez v. Maloney*, 990 F.3d 232, 237 (2d Cir. 2021). "When considering qualified immunity at the summary judgment stage," as

18

here, "courts must construe all evidence and draw all reasonable inferences in the non-moving party's favor." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (internal quotation marks and citation omitted). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In short, courts should view "the facts in the light depicted by the videotape." *Id*. at 381. Inasmuch as this appeal stems from an order granting defendant's motion for summary judgment, the ordinary principles of summary judgment govern: "Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). A genuine factual dispute exists, and summary judgment is therefore inappropriate, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. Qualified Immunity Principles

Qualified immunity is an affirmative defense available to a person defending a suit brought under 42 U.S.C. § 1983, which shields public officials,

including law enforcement officers, "from liability for civil damages [under that statute] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because qualified immunity is an affirmative defense, "[i]t is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). In other words, "[i]t is incumbent upon the defendant to plead[] and adequately develop[] a qualified immunity defense." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (quoting *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995)).

In general, "[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The qualified immunity question is subject to a two-prong analysis to determine whether: (1) "the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).

20

## III.    Relevant Constitutional Law

"When a plaintiff alleges excessive force during an investigation or arrest," as Ms. Linton has here, "the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).  Whether an officer has violated that right "requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"  *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  Courts must be "careful to evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (internal quotation marks and citation omitted).

When "conducting that balancing" in the context of police conduct with respect to a plaintiff, we consider the following so-called *Graham* factors:  "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect pose[d] an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  We are also to consider the following so-called *Figueroa* factors:  "[4] the need for the application of force, [5]

21

the relationship between the need and the amount of force that was used, [6] the extent of the injury inflicted, and [7] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001)). If this balancing exercise supports a conclusion that a reasonable jury could find that a defendant applied excessive force in a manner that was objectively unreasonable under the circumstances, after drawing inferences in the light most favorable to the plaintiff, the plaintiff has made out a constitutional violation for purposes of surviving the defendant's motion for summary judgment. *See, e.g., Tracy*, 623 F.3d at 98–99.

## IV. Analysis

Of the two prongs of the qualified-immunity analysis — whether (1) the facts that the plaintiff has alleged or shown make out a violation of a constitutional right and (2) the right at issue was clearly established at the time of the challenged misconduct — "courts have discretion to decide which [] to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656. Because the district court in the case

22

at bar only considered the "clearly established" prong of the qualified immunity analysis in determining that Sergeant Zorn is entitled to qualified immunity, we review it first.

A.     Amnesty America *Clearly Established the Relevant Right*

The "clearly established" prong of the qualified immunity defense requires that "officers are on notice that their conduct is unlawful" before they may be held personally liable for that conduct. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citation omitted). "A right is clearly established if the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks and citation omitted). "This requires that controlling authority or a robust consensus of cases of persuasive authority have recognized the right at issue." *Id.* at 738–39 (internal quotation marks and citation omitted). A district court need not determine that there is a case "directly on point to hold that a defendant's conduct violated a clearly established right," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 739 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)) (internal quotation

marks omitted).  "This requires a high degree of specificity. . . . [C]ourts must not

define clearly established law at a high level of generality . . . ."  *District of*

*Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018) (internal quotation marks and

citations omitted).

On appeal, Ms. Linton contends "that *Amnesty America* clearly established

law for qualified immunity purposes."  Appellant Br. at 30 n.8.  She argues that

the district court erred in concluding that *Amnesty America* "is silent as to the

['clearly established'] prong of the qualified immunity analysis."  Reply Br. at 7

(quoting *Linton*, No. 5:18-cv-5, 2022 WL 17080324 at *14).  The district court

reasoned that *Amnesty America* was silent because (1) "[q]ualified immunity was

not at issue in *Amnesty America*" inasmuch as there, the plaintiffs sued the town

of West Hartford under *Monell v. Department of Social Services*, 436 U.S. 658

(1978),[6] rather than individual defendants in their personal capacities; and (2)

"[t]he *Amnesty America* court did not resolve the Fourth Amendment issue

because there were disputes of material fact."  *Linton*, No. 5:18-cv-5, 2022 WL

17080324 at *14 (internal quotation marks and citation omitted).  We agree with

---

[6] In *Monell*, the Supreme Court held that local governments could be held liable for the unconstitutional actions of their employees under 42 U.S.C. § 1983 when the constitutional deprivation of the plaintiff arose from a governmental policy or custom. 436 U.S. at 690–91.

24

Ms. Linton's contrary view, however.  Neither the fact that *Amnesty America* did not concern qualified immunity nor that it involved disputes of material fact precludes a conclusion here that *Amnesty America* did clearly establish the relevant right.

In *Amnesty America*, anti-abortion protestors held two demonstrations at a women's health center in West Hartford, Connecticut.  361 F.3d at 118.  Following the first demonstration, protestors gathered in the reception area of the clinic and "chained themselves together in order to block entry to the area in which medical services were provided."  *Id.*  When police attempted to remove the protestors, the protestors "employed 'passive resistance' techniques to impede their arrest, including going limp, refusing to identify themselves, and refusing to unlock the chains that they had used to bind themselves together."  *Id.*  The protestors did not dispute that the police needed to use some degree of force to remove them from the premises, but they alleged that the police had used more force than necessary, causing many of the protestors severe pain and lasting injuries.  *Id.* at 118–19.  Among the tactics alleged to have been used by the police included "throwing [one plaintiff] face-down to the ground, dragging [another plaintiff] face-down by his legs, causing a second-degree burn on his

chest; placing a knee on [a third plaintiff]'s neck in order to tighten his handcuffs while he was lying face-down, ramming [that third plaintiff's] head into a wall at a high speed," and so-called "pain compliance techniques," including "pressing [the protestors'] wrists back against their forearms in a way that caused lasting damage." *Id.* at 119, 123.

Following allegations of similar excessive force employed by law enforcement at a second demonstration, several of the protestors brought suit against the Town of West Hartford, alleging that the municipality was liable for the injuries inflicted by the use of excessive force by its police officers under *Monell*, *supra*, because it failed to adequately train and supervise those officers. This Court remanded the failure-to-supervise claim, holding in part that to decide that issue, a jury would be required to make a "determination as to the objective reasonableness of the force used." *Id.* at 124. We decided that the "[p]laintiffs' allegations [were] sufficient to create issues of fact as to the objective reasonableness of the degree of force used by the police officers." *Id.* at 123. But we observed that if plaintiffs' allegations were true, such conduct was "sufficient to allow a reasonable factfinder to conclude that the force used was excessive." *Id.* at 123–24 (citing *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987)). In other

words, if a jury found that the officers engaged in the conduct the plaintiffs alleged they had against protestors who were only passively resisting, then those officers used excessive force. *Amnesty America* thus put officers on notice that engagement thereafter in such techniques under such conditions would violate an arrestee's Fourth Amendment rights.

As to the district court's decision here, a case need not involve qualified immunity to clearly establish that specific conduct is unconstitutional. When determining whether a right is "clearly established," the relevant question is whether engaging in that conduct would plainly violate a constitutional right. This Court has not required that for a right to be clearly established, a case must explicitly warn an officer that engaging in such conduct would deprive him of qualified immunity. We decline to impose such a requirement here; we have previously recognized "clearly established" rights from cases that did not involve qualified immunity. In *Horn v. Stephenson*, for example, we held that "[i]t was clearly established [for qualified immunity purposes] . . . that police forensic examiners must disclose exculpatory information" or they will have violated their *Brady* obligations. 11 F.4th 163, 171 (2d Cir. 2021). It was clearly established, we explained, because *Walker v. City of New York*, 974 F.2d 293 (2d

27

Cir. 1992)—a § 1983 municipal liability case that did not concern qualified immunity—provided defendants with "fair warning that [their conduct] was unconstitutional." *Horn*, 11 F.4th at 171 (internal quotation marks and citation omitted).

Additionally, that our decision in *Amnesty America* was not a final decision as to a qualified immunity issue, but only a vacatur of a grant of summary judgment and a remand in light of the existence of genuine issues of material fact, does not bear on whether it "clearly established" a right. What matters is whether we made clear what conduct—irrespective of whether the particular defendant in that case engaged in it—*would* be violative of the plaintiff's constitutional rights. We did that in *Amnesty America*. And we have often held that cases in similar procedural postures clearly establish rights, independent of whether the defendant, on remand, was held to have violated that particular right. *See, e.g.*, *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020) (citing *Tracy*, 623 F.3d at 98–99, as a case that clearly established the relevant law despite its procedural posture); *Rogoz v. City of Hartford*, 796 F.3d 236, 250 (2d Cir. 2015) (citing, among other cases, *Robison*, 821 F.2d at 924, for the same despite its procedural posture); *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) (citing

28

*Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997), for the same despite its procedural posture).

*Tracy*, *supra*, is instructive.  There, we explained that "infliction of pepper spray . . . should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer."  623 F.3d at 98.  We continued, employing language similar to that used in *Amnesty America*, that "a reasonable juror could find that [the defendant's conduct in the plaintiff's version of the events] constituted an unreasonable use of force."  *Id*. at 98–99 ("Here, if a jury credited Tracy's version of the events . . . it might well conclude that the use of that pepper spray was unreasonable under the circumstances.").  Because there existed genuine issues of material fact as to whether the plaintiff's version of the events was accurate, however, we vacated the district court's grant of summary judgment and remanded the case to allow the jury to determine whether it was.  *Id.* at 104.

Despite *Tracy*'s procedural posture, we have consistently held that it clearly established that the use of gratuitous force, whether by pepper spray, taser, or similar significant force, against a non-resistant or handcuffed arrestee violates that arrestee's Fourth Amendment rights.  *See, e.g., Jones*, 963 F.3d at 226

29

("It follows then that, after *Tracy*, any reasonable officer would understand that, because it violated clearly established law to use pepper spray against a non-resisting and non-threatening individual, the same would be true for the use of a taser."); *see also Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) ("On July 22, 2016, it was therefore clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting."); *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 69 (2d Cir. 2018) ("It is clearly established that officers may not use a taser against a compliant or non-threatening suspect.").

We likewise concluded that *Amnesty America* clearly established a relevant right in *Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018). Although *Edrei* itself did not provide notice to Sergeant Zorn because we decided *Edrei* after Sergeant Zorn arrested Ms. Linton, "we have considered cases published after the conduct at issue that do not establish a right in the first instance, but rather address whether a right was clearly established by case authority *before* the time of such conduct." *Jones*, 963 F.3d at 227 (emphasis in original). And in *Edrei*, a case in which we determined that the prohibition of excessive force applies to protestors, we explained that *Amnesty America* "warned officers against gratuitously employing

30

'pain compliance techniques,' such as bending protestors' wrists, thumbs, and fingers backwards." *Edrei*, 892 F.3d at 541 (quoting *Amnesty Am.*, 361 F.3d at 119, 123–24). Consistent with our understanding in *Edrei*, therefore, we continue to read *Amnesty America* to provide government officials with the sort of notice required to satisfy the "clearly established" prong of the qualified immunity analysis.

Therefore, disagreeing with the district court's decision, we conclude that *Amnesty America* did clearly establish a right for qualified immunity purposes as Ms. Linton contends. Although the relevant question then becomes whether *Amnesty America* is on point vis-à-vis Sergeant Zorn's conduct, we conclude that *Amnesty America* did clearly establish that the gratuitous use of pain compliance techniques—such as a rear-wristlock—on a protestor who is passively resisting arrest constitutes excessive force and is therefore violative of that arrestee's Fourth Amendment rights.[7] Police officers, including Sergeant Zorn, were or

---

[7] We have also suggested that out-of-Circuit precedent puts police on notice that they "may violate clearly established law by *initiating* significant force against a suspect who is only passively resisting." *McKinney v. City of Middletown*, 49 F.4th 730, 742 (2d Cir. 2022) (citing *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established [at the time of the relevant conduct].")). "As a general rule, to determine whether a right is clearly established, we consider Supreme Court decisions,

31

should have been on notice on January 8, 2015 that they could be held personally

liable for such conduct.[8]

B.      *Constitutional Violation*

Because the district court granted Sergeant Zorn's motion for summary

judgment on the basis that the right allegedly violated was not clearly

established, the district court did not fully consider the first prong of the

qualified immunity analysis.  *See Linton*, No. 5:18-cv-5, 2022 WL 17080324, at *9

("The court need not decide that question here because, even assuming that Sgt.

Zorn violated Ms. Linton's Fourth Amendment right not to be subjected to

excessive force during arrest, Sgt. Zorn is entitled to qualified immunity under

the second prong for the reasons discussed below.").  We consider that first

---

our own decisions, and decisions from other circuit courts." *Cugini v. City of New York*,
941 F.3d 604, 615 (2d Cir. 2019) (internal quotation marks and citation omitted).

[8] Ms. Linton also suggests that *Tracy, supra*, clearly establishes that the conduct she
alleges Sergeant Zorn to have engaged in violated her Fourth Amendment rights.
Although we have explained that *Tracy* did clearly establish that "an officer's significant
use of force against an arrestee who was no longer resisting and who posed no threat to
the safety of officers or others—whether such force was by pepper spray, taser, or any
other similar use of significant force—violates the Fourth Amendment," we think
*Amnesty America* clearly established the relevant right in identifying "the violative
nature of [Sergeant Zorn's alleged] *particular* conduct . . . in light of the specific context
of the case" before us.  *Jones*, 963 F.3d at 226–27 (internal quotation marks and citation
omitted).

prong here, however, because Sergeant Zorn is entitled to qualified immunity if

Ms. Linton has not, at minimum, demonstrated that there exist genuine issues of

material fact as to whether Sergeant Zorn utilized objectively unreasonable force

in effecting her arrest.

In assessing whether Sergeant Zorn may have violated Ms. Linton's Fourth

Amendment rights, we must examine whether the facts "[t]aken in the light most

favorable to the party asserting the injury, . . . show the officer's conduct violated

a constitutional right." *Saucier*, 533 U.S. at 201. We conclude that, prior to

making this determination, a jury in the district court must resolve genuine

issues of material fact. A grant of summary judgment is therefore inappropriate

at this juncture. The resolution of these facts is material because if we are to

credit Ms. Linton's version of the events, a reasonable juror could find that

Sergeant Zorn's use of force—*i.e.*, his use of pain compliance techniques such as a

rear wristlock—constituted an unreasonable use of force, consistent with the

facts and our holding in *Amnesty America*.[9] We note, however, that a jury might

---

[9] Although the district court refrained here from opining on whether it could conclude, as a matter of law, that the force Sergeant Zorn used was reasonable under the circumstances, it later explained that "[o]n the issue of the objective reasonableness of the force used . . . *Amnesty America* suggests that the question might be one for a jury,

alternatively determine that Sergeant Zorn's use of force was reasonable under the circumstances, depending in large measure upon its resolution of these factual disputes.

As for the *Graham* and *Figueroa* factors,[10] the facts relevant to several of them are not in dispute:  The crime for which Ms. Linton was arrested does not seem to be "particularly severe."  *See Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 406 (D. Vt. 2009) (severity of unlawful trespass is "low"), *aff'd*, 400 F. App'x 592 (2d Cir. 2010) (summary order).  Nor does the threat to safety posed by Ms. Linton and her fellow demonstrators appear to be particularly high.  *See* J. App'x at 220 (deposition of Trooper Richardson stating that the level of safety threat was "[v]ery low").  The protestors had passed through security (and therefore must have been considered to be unarmed), did not significantly outnumber police, and are not accused of being volatile or violent.  Finally, the record

---

not for a judge ruling on summary judgment."  *Linton*, No. 5:18-cv-5, 2022 WL 17080324, at *14.  We agree.

[10] The district court considered the *Graham* and *Figueroa* factors in analyzing the second prong of the qualified immunity analysis, and not the first.  *See Linton*, No. 5:18-cv-5, 2022 WL 17080324, at *9–13.

reflects, and neither party disputes, that Ms. Linton suffered permanent loss of

motion in her left wrist and shoulder as a result of the incident.

The parties do dispute several facts material to our analysis of three of the

remaining *Graham* and *Figueroa* factors, however.  Ms. Linton contends that (1)

she was, at worst, passively resisting arrest; (2) even if some degree of force was

needed, Sergeant Zorn's use of force was not sufficiently related to that need;

and (3) Sergeant Zorn did not apply the force in good faith.[11]  Sergeant Zorn

counters that (1) Ms. Linton was actively resisting arrest; (2) his use of force was

appropriate in light of the need for it; and (3) he acted in good faith.

As to the degree of resistance offered by Ms. Linton, Mr. Eastman defined

"[p]assive [r]esistance" as "refusing to comply, but . . . not physically resist[ing]

the officers."  J. App'x at 112.  Our case law suggests that passive resistance

includes "going limp, refusing to identify themselves, and refusing to unlock the

chains that they had used to bind themselves together." *Amnesty Am.*, 361 F.3d at

118.  The record reflects that Ms. Linton's and Sergeant Zorn's dispute here is

---

[11] The relevant question concerns "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson*, 239 F.3d at 252 (internal quotation marks and citation omitted).

genuine.[12]  During Ms. Linton's arrest, the two disputed whether she was actively resisting, and Ms. Linton asserted that she did not comply because she was in too much pain to do so.

Sergeant Zorn contends that the video of the arrest plainly demonstrates that his version of events is correct and therefore no genuine issue of material fact exists.  Appellee Br. at 29.  We disagree.  Although video evidence may be credited over a non-movant's account if the video "blatantly contradict[s]" that account, *Scott v. Harris*, 550 U.S. 372, 380 (2007), we do not think that is the case here.  In our view, a reasonable finder of fact could determine at trial that, based upon the video and the remainder of the record, including Mr. Eastman's definition of passive resistance, she was not actively resisting arrest.  We therefore leave the resolution of this question, if necessary, to the finder of fact at trial.

Even if we view the record in the manner that Ms. Linton does, however, we do not think that a reasonable juror could find that she was not resisting arrest at all when Sergeant Zorn first engaged pain compliance techniques.  *See,*

---

[12] The district court also explained that "there now appears to be a dispute about the extent to which Ms. Linton might have resisted Sgt. Zorn's efforts to control her arm before lifting her to her feet."  *Linton*, No. 5:18-cv-5, 2022 WL 17080324, at *11.

*e.g.*, Appellant Br. at 41.  It is undisputed that Ms. Linton did not comply with the officers' commands, and the record reflects that she did not intend to leave the Statehouse willingly.[13]  *See, e.g.*, J. App'x at 167:19–:22 (deposition of Shela Linton) ("Q. . . . So based on [your] understanding or definition of passive resistance, did you engage in passive resistance that night at the statehouse?  A. Yes."); J. App'x at 112–13 (Mr. Eastman's expert report describing Ms. Linton's resistance throughout the arrest); J. App'x at 156–57 (describing Ms. Linton's intention to remain in the Statehouse after officers requested that she leave or be arrested); *see also generally* Video 3.  Ms. Linton had also witnessed the arrest of fellow demonstrators prior to being approached by Sergeant Zorn such that it would be unreasonable to conclude that she did not know his purpose in approaching her.  And we have held that "[t]he fact that a person whom a police officer attempts to arrest resists . . . no doubt justifies the officer's use of *some* degree of force."  *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000) (emphasis in original).  Accordingly, we do not think that the dispute between

---

[13] Ms. Linton claims that she did not hear any clear command from Sergeant Zorn or Trooper Richardson.  Even if this is true, we think it reasonable for Sergeant Zorn to have believed that she had heard and disregarded his commands based upon the videographic evidence in the record, therein making his belief that he needed to use force to effect her arrest reasonable.

the parties as to "the need for the application of force," *Figueroa*, 825 F.3d at 105

(internal quotation marks and citation omitted), is a genuine one. An officer

necessarily must use *some* amount of force to arrest an individual who is

unwilling to comply with the officer's commands preceding the arrest. *See, e.g.,*

*id.* ("The officers had need to push [the plaintiff] along because he lightly resisted

by stiffening his legs.").

However, the jury will also be faced with the question of whether the force

used was reasonably related to the need for force. We have held that a person's

attempt to resist arrest "does not give the officer license to use force without

limit." *Sullivan*, 225 F.3d at 165–66. "The force used by the officer must be

reasonably related to the nature of the resistance and the force used . . . against

the officer." *Id.* at 166.

Ms. Linton argues that Sergeant Zorn's use of pain compliance techniques

was not reasonably related to any need to use force. To support this conclusion,

she points to the fact that officers did not use pain compliance techniques in the

arrests of her fellow protestors despite the refusal of some of those arrestees to

stand and walk out of the chamber with the officers, and further suggests that

the Vermont State Police use-of-force policy does not suggest that law

38

enforcement personnel use pain compliance techniques in response to passive resistance. That Mr. Eastman stated that the general police practice in response to passive resistance is "low level physical contact . . . with little or no pain," J. App'x at 112, suggests that, depending upon the jury's determination as to the level of resistance offered by Ms. Linton, a jury may agree that Sergeant Zorn's use of force was not called for. Sergeant Zorn, however, suggests that the force he utilized was compatible with the force required to effect Ms. Linton's arrest considering her resistance to Sergeant Zorn. "The assessment of a jury is needed" to resolve this factual dispute. *Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015).

Finally, the parties dispute whether Sergeant Zorn acted in good faith. Sergeant Zorn argues that he used pain compliance "in a good faith effort to complete the arrest." Appellee Br. at 57. But Ms. Linton said that, after Sergeant Zorn applied the pain compliance technique, he told her, "you should have just called your legislator." J. App'x at 190:19–:20. As Sergeant Zorn's counsel conceded at oral argument, Trooper Richardson's deposition testimony,[14] when

---

[14] When posed with the question "If I told you that Officer Zorn told her that she could have just called her legislators, what would you think about that?" Trooper Richardson responded, "That's accurate." J. App'x at 228:22–:25.

39

viewed in the light most favorable to Ms. Linton, could be reasonably understood to corroborate that Sergeant Zorn made such a statement. In light of the context in which this statement is alleged to have been made—following a political protest at the Statehouse—a reasonable jury might determine that such a statement, if made, evinces bad faith. It should therefore be left to a jury to make the predicate factual findings to determine whether Sergeant Zorn did or did not act in bad faith.

Viewing the record in the light most favorable to Ms. Linton, as we must, we conclude that summary judgment is inappropriate. A reasonable juror, after reviewing the evidence (including the clear and complete video recordings of the events), could draw inferences that support either Ms. Linton's or Sergeant Zorn's version of the events. If a jury were to adopt Ms. Linton's version as to those facts genuinely in dispute *in toto*, we conclude, as we did in *Amnesty America*, that it could determine that the defendant's use of force was objectively unreasonable. If, however, a jury resolves these facts in accordance with Sergeant Zorn's version of the events, it may determine that he did not violate Ms. Linton's Fourth Amendment rights, or that his conduct was not clearly unreasonable in light of the teaching of *Amnesty America*. Alternatively, if a jury

determines that Ms. Linton only passively resisted arrest *but* Sergeant Zorn mistakenly believed that Ms. Linton was actively resisting arrest and his use of force would have been appropriate had Ms. Linton been so resisting, he might well be entitled to qualified immunity. *See Jones*, 963 F.3d at 230–31. "[Q]ualified immunity can apply in the event the mistaken belief was reasonable." *Saucier*, 533 U.S. at 206.

Thus, whether Sergeant Zorn is entitled to qualified immunity depends upon the answer to at least one "question upon which we have found there are genuine issues of material fact." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003). We recognize that police have difficult jobs. They must often "make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. However, Sergeant Zorn "is not entitled to have the court, in lieu of the jury, make the needed factual finding" to determine whether he unreasonably used excessive force. *Zellner*, 494 F.3d at 368. Summary judgment in favor of Sergeant Zorn based on his entitlement to qualified immunity is therefore inappropriate at this juncture.

However, we understand that qualified immunity is "a question of law better left for the court to decide." *Estate of Cooper*, 352 F.3d at 764 (quoting

41

*Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)).  On remand, we therefore recommend, as is our practice, "that interrogatories on the key factual disputes be presented to the jury" as part of the verdict form so that the district court can decide whether Sergeant Zorn is entitled to qualified immunity based upon the jury's answers to those interrogatories if the jury first determines that Sergeant Zorn in fact used excessive force.  *Id.* (listing examples of questions to resolve key factual disputes); *see also Warren*, 906 F.2d at 76 (recommending the use of interrogatories to resolve the qualified immunity issue on remand).  "If the jury returns a verdict of excessive force against [the law enforcement defendant], the court should then decide the issue of qualified immunity."  *Stephenson v. Doe*, 332 F.3d 68, 80 (2d Cir. 2003); *see also Estate of Cooper*, 352 F.3d at 764 ("Thus, if the jury finds that [the law enforcement defendant] used excessive force against [the plaintiff], the court should then decide whether [the law enforcement defendant] is entitled to qualified immunity.").  If the court decides, based on the jury's answer to the interrogatories, that (1) Sergeant Zorn's conduct did not violate a constitutional right of Ms. Linton *or* (2) "it would [not have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Jones*, 963 F.3d at 224 (internal quotation marks and citation omitted), because his

42

conduct did not violate the *clearly established* right identified in *Amnesty America*, or because he was reasonably mistaken in believing that it did not, Sergeant Zorn will be entitled to qualified immunity, s*ee id.* at 230–31.[15]

Although we leave it to the district court to determine the scope of any such interrogatories, we note that "it is the responsibility of the defendant to request that the jury be asked the pertinent question." *Zellner*, 494 F.3d at 368.

## CONCLUSION

Based on the foregoing, we conclude that Sergeant Zorn is not entitled to qualified immunity at his stage of the proceedings, inasmuch as there exist genuine issues of material fact which we cannot address—because a proper fact finder must—that preclude a grant of summary judgment. The judgment of the district court is therefore **VACATED**, and this case is **REMANDED** for further proceedings consistent with this opinion.

---

[15] In other words, "if 'officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context,' the officer is entitled to qualified immunity." *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)) (internal quotation marks and citation omitted). But first, a jury must determine what that "particular factual context" is. *Id.*