# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

**Scott S. Harris**
Clerk of the Court
(202) 479-3011

March 23, 2026

Clerk
United States Court of Appeals for the Second
Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

Re:  Jacob P. Zorn
     v. Shela M. Linton
     No. 25-297
     (Your No. 22-2954)

Dear Clerk:

The Court today filed the attached opinion per curiam in the above entitled case.

The judgment or mandate of this Court will not issue for at least thirty-two days pursuant to Rule 45.  Should a petition for rehearing be filed timely, the judgment or mandate will be further stayed pending this Court's action on the petition for rehearing.

Sincerely,

*Scott S. Harris*

**Scott S. Harris**, Clerk

Cite as: 607 U. S. \_\_\_\_ (2026)          1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

JACOB P. ZORN *v.* SHELA M. LINTON

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 25–297.   Decided March 23, 2026

PER CURIAM.

On the Governor's inauguration day in Vermont, protesters staged a sit-in at the state capitol. When the capitol closed for the day, police officers told them that they would be arrested for trespassing. They refused to leave. As officers removed the protesters one by one, Sergeant Jacob Zorn asked Shela Linton to stand up and warned her that he would eventually have to use force to remove her. She refused to stand. Zorn took Linton's arm, put it behind her back, placed pressure on her wrist, and lifted her to her feet. Linton sued Zorn for using excessive force, claiming that the arrest left her with arm injuries and psychological disorders. The Second Circuit held that Zorn was not entitled to qualified immunity. We reverse.

I

On January 8, 2015, Vermont hosted the inauguration for Governor Peter Shumlin in the capitol.[1] About 200 protesters attended, and some of them staged a sit-in to demand universal healthcare. Shela Linton joined them. She planned to refuse to leave and anticipated being forcibly removed. "That's the point of the sit-in part of the protest," she later explained. Deposition of S. Linton in No. 5:18–cv–5 (D Vt., June 3, 2022), ECF Doc. 74–4, p. 127.

---

[1] Because this case comes here on Zorn's motion for summary judgment, we view the facts in the light most favorable to the nonmoving party, Linton. *City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 603 (2015).

2                          ZORN *v.* LINTON

Per Curiam

When the capitol closed to the public for the night, 29 pro-testers remained in the legislative chamber, sitting on the floor with their arms linked. At that point, police officers explained that they would arrest the protesters for trespass if they did not leave. The officers dealt with them one at a time; some stood up and were escorted out of the chamber without force, but others refused to stand and had to be lifted to their feet or dragged out.

After removing more than a dozen protesters, the officers turned to Linton. Sergeant Jacob Zorn crouched down to speak with her, but she remained seated with her arms in-terlocked with those of her fellow protesters. As Linton pas-sively resisted, Zorn unlinked her arm from another pro-tester's, put it behind her back in a rear wristlock, and twisted her arm.[2] Linton exclaimed "' ow, ow, ow,'" while Zorn repeatedly implored her to "'please stand up.'" App. to Pet. for Cert. 47–48. After Linton responded, "'I will not stand up,'" Zorn told her that he would ask "'one more time'" and then would use more pain compliance. *Id.,* at 48. Linton refused, so Zorn placed pressure on her wrist and lifted her up by her underarm. Linton yelled as she stood up. Once on her feet, Linton continued to jerk her arms and fell back to the floor. Zorn asked her to stand up again, and when she did not, three officers picked her up by her arms and legs and carried her outside. Linton alleged resulting physical and psychological injuries including post-trau-matic stress disorder.

Linton sued Zorn under Rev. Stat. §1979, 42 U. S. C. §1983, claiming that Zorn violated her Fourth Amendment

---

[2] A rear wristlock is a technique that officers use to gain control over a resistant person by gripping his wrist, placing it behind his back, and bending it backward. See U.S. Dept. of Justice, Use of Force by Police: Overview of National and Local Data 49 (Oct. 1999) (summarizing data showing that "[w]hen the suspects used slight resistance, most incidents involved officer use of verbal commands, handcuffing, or wrist/arm locks").

Per Curiam

right against excessive use of force. The District Court granted summary judgment for Zorn after concluding that he was entitled to qualified immunity. The District Court reasoned that it was not clearly established at the time of the encounter that, in these circumstances, lifting Linton while putting pressure on her wrist violated the Fourth Amendment.

The Second Circuit reversed. It held that its decision in *Amnesty America* v. *West Hartford*, 361 F. 3d 113 (2004), clearly established that the "gratuitous" use of a rear wrist-lock on a protester passively resisting arrest constitutes excessive force. 135 F. 4th 19, 35 (2025). It remanded for a jury trial against Zorn. Judge Cabranes dissented. "The case before us is not an exceptional case," Judge Cabranes reasoned, but "a routine arrest and removal." *Id.*, at 41.

II

Government officials enjoy qualified immunity from suit under §1983 unless their conduct violates clearly established law. *Rivas-Villegas* v. *Cortesluna*, 595 U. S. 1, 5 (2021) (*per curiam*). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Ibid.* A right is not clearly established if existing precedent does not place the constitutional question "'beyond debate.'" *Ibid.*

To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution. *Escondido* v. *Emmons*, 586 U. S. 38, 43 (2019) (*per curiam*) (internal quotation marks omitted). The relevant precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia* v. *Wesby*, 583 U. S. 48, 63 (2018) (internal quotation marks omitted).

4                    ZORN *v.* LINTON

Per Curiam

Principles stated generally, such as that "an officer may not use unreasonable and excessive force," do not suffice. *Kisela* v. *Hughes*, 584 U. S. 100, 105 (2018) (*per curiam*). In short, officers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "know[ n]" that it proscribed their specific conduct. *City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 616 (2015).

The Second Circuit contravened these principles. *Amnesty America* did not clearly establish that Zorn's specific conduct violated the Fourth Amendment.[3] Whether any particular use of force violates the Fourth Amendment depends on "the facts and circumstances of each particular case," *Graham* v. *Connor*, 490 U. S. 386, 396 (1989), including whether the officer gave "warnings" before using force, *Barnes* v. *Felix*, 605 U. S. 73, 80 (2025). In *Amnesty America*, the court considered a wide range of allegations of excessive force. The officers rammed a protester's head into a wall, dragged another protester across the ground, and used rear wristlocks on two more protesters to lift them up before throwing one of them to the ground. 361 F. 3d, at 123. Nothing indicated that the officers gave the protesters any warning that they would use such force.

*Amnesty America* did not hold that any of those actions violated the Fourth Amendment, let alone all of them. Instead, it remanded for a jury trial because, while a "reasonable jury *could* . . . find that the officers gratuitously inflicted pain," it was also "entirely possible that a reasonable jury would find . . . that the police officers' use of force was objectively reasonable given the circumstances." *Id.*, at 124 (emphasis added). Relevant here, *Amnesty America* even relied on a decision approving the practice of warning

——————

[3] We assume without deciding that "controlling Circuit precedent" can clearly establish law for qualified-immunity purposes. *Rivas-Villegas* v. *Cortesluna*, 595 U. S. 1, 5 (2021) (*per curiam*).

Per Curiam

protesters and then using wristlocks to move them. *Ibid.* (citing *Forrester* v. *San Diego*, 25 F. 3d 804, 807–808 (CA9 1994)).

Reasonable officials would not "interpret [*Amnesty America*] to establish" that using a routine wristlock to move a resistant protester after warning her, without more, violates the Constitution. *Wesby*, 583 U. S., at 63; see *Sheehan*, 575 U. S., at 615–616. Zorn repeatedly warned Linton that he would have to use more force if she did not stand up, and when she did not do so, he used a wristlock to bring Linton to her feet. See App. to Pet. for Cert. 47–49. *Amnesty America* never "held" that such conduct alone "violated" the Fourth Amendment. *Emmons*, 586 U. S., at 43 (internal quotation marks omitted). If anything, it implied the opposite. See *Amnesty America*, 361 F. 3d, at 124 (citing *Forrester*, 25 F. 3d, at 807–808). And its statement that officers who had engaged in a wide range of aggressive conduct may have used excessive force did not "put [Zorn] on notice that his specific conduct was unlawful." *Rivas-Villegas*, 595 U. S., at 6.

The Second Circuit concluded otherwise by reading *Amnesty America* to establish the general principle "that the gratuitous use of pain compliance techniques—such as a rear-wristlock—on a protestor who is passively resisting arrest constitutes excessive force." 135 F. 4th, at 35 (case below). But that principle, even assuming *Amnesty America* established it, lacks the "high degree of specificity" needed to make it "clear" to officers which actions violate the law. *Wesby,* 583 U. S., at 63 (internal quotation marks omitted). It does not "obviously resolve" whether using a rear wristlock to move a noncompliant protester after repeated warnings violates the Fourth Amendment, *id.*, at 64, as it fails to specify which circumstances make the use of force "gratuitous."

Because the Second Circuit failed to identify a case where an officer taking similar actions in similar circumstances

6 ZORN *v.* LINTON

Per Curiam

"was held to have violated" the Constitution, *Emmons*, 586 U. S., at 43 (internal quotation marks omitted), Zorn was entitled to qualified immunity. We grant his petition for writ of certiorari and reverse the judgment of the Second Circuit.

*It is so ordered.*

Cite as: 607 U. S. \_\_\_\_ (2026) 1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

## JACOB P. ZORN *v.* SHELA M. LINTON

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 25–297. Decided March 23, 2026

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and
JUSTICE JACKSON join, dissenting.

Sergeant Jacob Zorn used a "'pain compliance technique'" called a rear wristlock on Shela Linton, a nonviolent protestor who was peacefully demonstrating at a sit-in in the Vermont capitol. 135 F. 4th 19, 24–25 CA2 (2025). The Second Circuit held that Zorn was not entitled to qualified immunity on Linton's Fourth Amendment excessive force claim, at least at the summary judgment stage, because prior Circuit precedent had clearly established that using a rear wristlock against a nonviolent protestor would violate the protestor's constitutional rights. That decision was not erroneous, and certainly not so clearly erroneous as to warrant the "extraordinary remedy of a summary reversal." *Major League Baseball Players Assn.* v. *Garvey*, 532 U. S. 504, 512–513 (2001) (Stevens, J., dissenting). I respectfully dissent.

## I

Given that this case is at the summary judgment stage, the Court must "view the evidence . . . in the light most favorable to" Linton, the nonmovant, "with respect to the central facts of the case." *Tolan* v. *Cotton*, 572 U. S. 650, 657 (2014) (*per curiam*). Before Sergeant Zorn's interaction with Linton, officers had arrested 15 or 16 demonstrators: The "officers tapp[ed] some of the demonstrators' shoulders or sp[oke] briefly with them before the officers placed them under arrest." App. to Pet. for Cert. 44 (App.). "Some of the arrestees voluntarily stood up after officers approached

them," while the "[o]fficers lifted the demonstrators who did not stand up voluntarily and escorted, dragged, or carried them out of the chamber." *Ibid.* "Consistent with the concept of a nonviolent sit-in protest, . . . none of [the demonstrators] attacked the officers or used any form of violence." *Id.*, at 45. One officer, Trooper Richardson, described the "level of safety threat in the environment [as] '[v]ery low.'" *Ibid.* (alteration in original).

When Zorn and Richardson first approached Linton, they "did not issue any 'clear request or command,'" and the "video evidence appears to indicate that" one of them said only, "'ma'am?'" *Id.*, at 46. About five seconds later, Zorn and Richardson unlinked Linton's arms from the other demonstrators' arms. Without any warning—indeed, without saying another word to Linton—Zorn placed Linton's left arm into a rear wristlock by twisting her arm and shoulder, "snapp[ing]" her wrist, and "'forc[ing] it down and to the rear.'" *Id.*, at 47; Plaintiff's Supp. Affidavit in No. 5:18–cv–5 (D Vt.), ECF Doc. 74–3, p. 2. Linton immediately exclaimed, "'ow, ow, ow!'" App. 47. Only then did Zorn instruct Linton to "'please stand up.'" *Id.*, at 48.

Linton did not stand up, at which point Zorn further twisted Linton's arm. "Linton's face contorted in pain as she stated, 'my arm!' or 'don't twist my arm!'" *Ibid.* Zorn asked Linton to stand up several more times. Linton refused and replied: "'You're hurting me.'" *Ibid.* Zorn then warned Linton: "'I'm going to ask you one more time . . . and then I will use more pain compliance.'" *Ibid.* Linton repeated that Zorn was "'hurting'" her and did not move to stand up. *Id.*, at 49. Zorn then applied pressure to Linton's wrist and lifted her upward, causing Linton to "contor[t] her face in pain and . . . scream very loudly." *Ibid.* Zorn whispered to her that "she should have called her legislator." *Ibid.*

After being hauled to her feet, Linton collapsed back onto the floor "due to pain and feeling weak." *Id.*, at 50. Zorn,

SOTOMAYOR, J., dissenting

Richardson, and a third officer "lifted" her "by her arms and legs and carried her out of the House chamber" without further use of a rear wristlock or any other pain-compliance technique. *Id.*, at 51. As a result of this event, Linton "suffered permanent damage to her left wrist and shoulder" and has been "diagnosed with post-traumatic stress disorder, depression, and anxiety." 135 F. 4th, at 25.

## II

Officers are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia* v. *Wesby*, 583 U. S. 48, 62–63 (2018). The Second Circuit correctly held that summary judgment must be denied because a jury could find that Zorn violated Linton's clearly established Fourth Amendment rights.

## A

Starting with the first prong of the qualified immunity analysis, Linton contends that Zorn violated her Fourth Amendment rights by using excessive force during her arrest. Determining whether a given use of force is excessive requires a "careful balancing of '"the nature and quality of the intrusion on the individual's Fourth Amendment interests"' against the countervailing governmental interests at stake." *Graham* v. *Connor*, 490 U. S. 386, 396 (1989). The inquiry depends on the "'totality of the circumstances,'" "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, . . . whether [s]he is actively resisting arrest or attempting to evade arrest by flight," *ibid.*, the "relationship between the need for the use of force and the amount of force used[, and] the extent of [her] injury," *Kingsley* v. *Hendrickson*, 576 U. S. 389, 397 (2015).

4                    ZORN *v.* LINTON

SOTOMAYOR, J., dissenting

Here, the Second Circuit rightly concluded that a reasonable jury could find that Zorn's use of force was excessive in violation of the Fourth Amendment. See 135 F. 4th, at 36. First, the crime of trespass for which Linton was arrested is not "'particularly severe.'" *Ibid.* Second, it is undisputed that the threat to safety posed by Linton was relatively low. Trooper Richardson described the level of safety risk as "'[v]ery low.'" *Ibid.* The protestors also "passed through security (and therefore must have been considered to be unarmed), did not significantly outnumber police," and were "not accused of being volatile or violent." *Ibid.* Third, it is also undisputed that Linton "suffered permanent loss of motion in her left wrist and shoulder as a result of the incident." *Ibid.* Fourth, there is a material dispute of fact as to whether Linton was actively resisting arrest, and a jury reasonably could conclude that Linton was only passively resisting and that her failure to comply was because she was "in too much pain to do so." *Id.*, at 37. Finally, a jury also reasonably could conclude that the use of pain compliance was not "reasonably related to any need to use force." *Id.*, at 38. The officers purportedly "did not use pain compliance techniques in the arrests of . . . fellow protestors," and Linton contends that "the Vermont State Police use-of-force policy does not suggest . . . us[ing] pain compliance techniques in response to passive resistance." *Ibid.* Further, Zorn's own expert stated that "the general police practice in response to passive resistance is 'low level physical contact . . . with little or no pain.'" *Ibid.* Taken together, a jury could reasonably conclude that Zorn used excessive force in violation of Linton's Fourth Amendment rights.

B

The second prong of the qualified immunity analysis asks whether the "unlawfulness of [the official's] conduct was 'clearly established at the time,'" *Wesby*, 583 U. S., at 63, which requires assessing whether the "contours of the right

SOTOMAYOR, J., dissenting

[are] sufficiently clear that a reasonable official would understand that what he is doing violates that right," *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987). "[E]arlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002), but there need not be a " ' "case directly on point," ' " *White* v. *Pauly*, 580 U. S. 73, 79 (2017) (*per curiam*).

In addition to the long-established principle that officers may use only the "amount of force that is necessary in a particular situation," *Graham*, 490 U. S., at 397, the Second Circuit's prior case, *Amnesty America* v. *West Hartford*, 361 F. 3d 113 (CA2 2004), "clearly establish[ed] that the gratuitous use of pain compliance techniques—such as a rear-wristlock—on a protestor who is passively resisting arrest constitutes excessive force." 135 F. 4th, at 35. In that case, officers used multiple forms of force to arrest anti-abortion protestors who had chained themselves together in front of a women's center. *Amnesty America*, 361 F. 3d, at 118. The plaintiffs alleged that the officers had used excessive force to remove them, including by using a rear wristlock and other pain compliance techniques. *Ibid.* Two plaintiffs in that case were treated much like Linton was: Officers "lift[ed] and pull[ed]" them off the floor "by pressing their wrists back against their forearms in a way that caused lasting damage." *Id.*, at 123. The Circuit then held that, under past cases, "allegations involving comparable amounts of force used during the arrest of a nonviolent suspect are sufficient to allow a reasonable factfinder to conclude that the force used was excessive." *Id.*, at 123–124.

*Amnesty America*'s specific discussion of rear wristlocks thus clearly established that using a rear wristlock against a nonviolent, passively resisting protestor could constitute excessive force. It therefore put Zorn on notice, to a "high 'degree of specificity,'" *Wesby*, 583 U. S., at 63, that using the same technique against a passively resisting protestor

SOTOMAYOR, J., dissenting

like Linton would expose him to liability for violating Linton's Fourth Amendment rights.

### C

The Court's attempts to distinguish *Amnesty America* are mistaken. It first claims that *Amnesty America* differs from this case because the officers there did not give "any warning" to the protestors, while Zorn "repeatedly warned Linton" here. *Ante*, at 4–5. That distinction misrepresents both cases. *Amnesty America*, in fact, did involve warnings: It observed that the "police purportedly employed" the pain-compliance techniques "only after they were unsuccessful in verbally convincing protestors to move." 361 F. 3d, at 119. By comparison, in this case, construing the evidence in favor of Linton (as is required), Zorn "did not issue any 'clear request or command'" before applying a rear wristlock and began asking her to stand only after he had initiated the wristlock. App. 46; see ECF Doc. 74–3, p. 2 (Linton "was not given warning before [Zorn] initiated the use of pain compliance"). *Amnesty America* thus involved "'an officer acting under similar circumstances,'" *Escondido* v. *Emmons*, 586 U. S. 38, 43 (2019) (*per curiam*), and put Zorn on notice that his actions would violate established law.

It is true that, after initiating the wristlock, Zorn warned Linton that he would use "'more pain compliance'" if she did not stand up, App. 48, whereas the *Amnesty America* opinion does not specify whether similar warnings were given after the initiation of the wristlocks. If that is the difference on which the majority relies, the majority is essentially requiring Linton to find a factually identical case, a requirement that this Court has repeatedly rejected. See, *e.g.*, *Anderson*, 483 U. S., at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful"); *Hope*, 536 U. S., at 741 (explaining that "'fundamentally similar'" cases can be helpful but are not necessary).

SOTOMAYOR, J., dissenting

The majority also suggests that *Amnesty America* considered a "wide range" of conduct, implying that it did not specifically address rear wristlocks like the one at issue here. *Ante*, at 4. That, too, is inconsistent with the actual opinion, which recognized that each plaintiff had "standing to assert only those constitutional deprivations that they themselves [were] alleged to have suffered" and specifically identified the use of a rear wristlock against some passively resisting protestors as "sufficient to allow a reasonable factfinder to conclude that the force used was excessive." 361 F. 3d, at 123–124, and n. 6.

The Court next reasons that *Amnesty America* did not clearly establish any law because it stated that while a "reasonable jury could . . . find that the officers" used excessive force, it was also "entirely possible that a reasonable jury would find . . . that the police officers' use of force was objectively reasonable given the circumstances and the plaintiffs' resistance techniques." *Id.*, at 124; see *ante*, at 4–5. These statements in *Amnesty America*, however, reflect that the Second Circuit was reviewing a district court's grant of summary judgment in favor of the defendants where there was factual uncertainty. In reversing the grant of summary judgment, the Second Circuit held that if the plaintiffs' allegations were true, they would be "sufficient to allow a reasonable factfinder to conclude that the force used was excessive," but it found that there were material disputes on "issues of fact" that could not be resolved at summary judgment. 361 F. 3d, at 123–124. Thus, when *Amnesty America* stated that a reasonable jury could rule for the officers, it was merely acknowledging the reality that the jury might well resolve those material factual disputes in favor of the defendants and find that the officers' use of force, under the circumstances that truly occurred, was not excessive. *Id.*, at 124. That possibility, however, does not change the fact that the Second Circuit held the use of a wristlock could be excessive if events had

SOTOMAYOR, J., dissenting

transpired the way plaintiffs alleged they had in that case. See 135 F. 4th, at 33. Indeed, the Second Circuit has long held that "a vacatur of a grant of summary judgment and a remand in light of the existence of genuine issues of material fact" may clearly establish a constitutional violation, *id.*, at 34, and the dissent below agreed, *id.*, at 40 (Cabranes, J., concurring in part and dissenting in part).

At bottom, the majority's analysis rests on the assumption that the law can be clearly established only by factually identical "'"case[s] directly on point,"'" despite the Court's rejection of such a standard. *White*, 580 U. S., at 79. Instead, it is "enough that governing law places 'the constitutionality of the officer's conduct beyond debate.'" *Kisela* v. *Hughes*, 584 U. S. 100, 120 (2018) (SOTOMAYOR, J., dissenting) (quoting *Wesby*, 583 U. S., at 63). Here, taking the facts in the light most favorable to Linton, it is "beyond debate" that Zorn's use of pain compliance against the passively resisting Linton was excessive. Accordingly, Zorn was not entitled to summary judgment based on qualified immunity.

*        *        *

For the foregoing reasons, the Second Circuit did not err in holding that Zorn is not entitled to qualified immunity at this stage. At the very least, the decision below was not so wrong as to warrant the "extraordinary remedy of a summary reversal." *Garvey*, 532 U. S., at 512–513 (Stevens, J., dissenting). Relying on disputed facts, the Court today simply disagrees with how the Second Circuit applied a correctly stated legal standard (the requirement that law be established to "'a high degree of specificity'" in the qualified immunity analysis) to this particular set of facts. 135 F. 4th, at 32 (quoting *Wesby*, 583 U. S., at 63). That is a routine, and nowhere near extraordinary, dispute that did not require the Court's intervention.

In the past, I have noted the "troubling asymmetry" in this Court's "unflinching willingness 'to summarily reverse

SOTOMAYOR, J., dissenting

courts for wrongly denying officers the protection of qualified immunity' but 'rarely interven[ing] where courts wrongly afford officers the benefit of qualified immunity.'" *Kisela*, 584 U. S., at 121 (SOTOMAYOR, J., dissenting). This case unfortunately represents a resurgence and perpetuation of this "one-sided approach to qualified immunity" that "transforms the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment." *Ibid.* The majority today gives officers license to inflict gratuitous pain on a nonviolent protestor even where there is no threat to officer safety or any other reason to do so. That is plainly inconsistent with the Fourth Amendment's fundamental guarantee that officers may only use "the amount of force that is necessary" under the circumstances. *Graham*, 490 U. S., at 396. Therefore, I respectfully dissent.